IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


TY ROLLINS; PARKER ROLLINS; A.R.,
a minor, by her father and next friend, Ty
Rollins; S.B., a minor, by her parents and
next friends, Mathew Bailey and Alana
Bailey,

No. 3:20-cv-00900-HZ

OPINION & ORDER

              Plaintiffs,

     v.

MCMINNVILLE SCHOOL DISTRICT
040; RYAN MCIRVIN; AMY FAST,

              Defendants.


Jennifer J. Middleton
Caitlin V. Mitchell
Johnson Johnson Lucas & Middleton PC
975 Oak Street, Suite 1050
Eugene, OR 97401

       Attorneys for Plaintiff

1 – OPINION & ORDER

Karen M. Vickers
Beth F. Plass
Vickers Plass LLC
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiffs, a former assistant high school cross-country coach and three student athletes,

bring claims for retaliation under Title IX, claims for retaliation in violation of the First

Amendment under 42 U.S.C. § 1983, and related claims under Oregon statutes and the Oregon

Constitution against McMinnville School District ("MSD") and the principal and athletic

director of McMinnville High School. Defendants move for summary judgment on all claims.

The Court grants in part and denies in part Defendants' motion [18].

## BACKGROUND

      Plaintiff Ty Rollins ("Rollins"), the father of plaintiffs Parker Rollins ("Parker") and

A.R., was an assistant coach for the McMinnville High School cross-country team from 2016 to

2019. McMinnville High School has one cross-country head coach who oversees both the boys'

and girls' teams. Rollins served as an assistant to coach the girls' team, whose members included

Parker and A.R. ("Student Plaintiffs").[1] Rollins Decl. ¶ 2, ECF 24-28. Rollins was also a

volunteer coach over the distance runners for the girls' track team. Middleton Decl. Ex. 7

("Downs Dep.") 26:3-7, ECF 24-7. During the 2018 season, the girls' cross-country team won

the Pacific Conference championship for the first time in fifteen years, and Rollins was named

Pacific Conference girls' cross-country coach of the year. Rollins Decl. ¶ 3. At the end of the

---

[1] Plaintiff S.B. ran track at McMinnville High School but never ran as member of the cross-country team. Supp. Vickers Decl. Ex. 4 ("S.B. Dep. II") 28:11-12, ECF 32-4.

2018/2019 school year, head cross-country coach Vic Downs retired. *Id.* at ¶ 5. Rollins did not apply for the head coach position. *Id.* at ¶ 6. In the summer of 2019, MSD hired Drew Wasmund to be the new head coach of the McMinnville cross-country team. Middleton Decl. Ex. 1 ("McIrvin Dep I") 66:6-10, ECF 24-1. Wasmund had previously been a coach at Wilsonville High School. Vickers Decl. Ex. 2 ("McIrvin Dep. II") 64:8-18, ECF 19-2.

At the request of McMinnville High School athletic director Ryan McIrvin, Rollins met with Wasmund shortly after he was hired. After that meeting, through a google search, Rollins discovered two 2016 college newspaper articles that mentioned a romantic relationship between Wasmund, who was 27 years old at the time, and a 19-year-old female student athlete he had coached at Clackamas Community College. Rollins Decl. ¶ 6; Pl. Ex. 15. Clackamas Community College did not renew Wasmund's coaching contract in 2016 because of that relationship. McIrvin Dep. I 79:17-20.

On July 2, 2019, Rollins showed McIrvin the two articles and told him he was concerned about Wasmund coaching girls at McMinnville High School. Rollins Decl. ¶ 7. During that meeting, Rollins also discussed what he perceived to be existing inequities between the girls' and boys' cross-country programs. *Id.* Rollins said that the girls' cross-country team had not received enough coaching attention from the previous head coach, which he was concerned would continue under Wasmund. McIrvin Dep. I 73:2-19. Rollins then turned in his ID badge and resigned, stating that he would not coach alongside a head coach who had "crossed the line by dating an athlete." Middleton Decl. Ex. 3 ("Rollins Dep. I") 51:21-25, ECF 24-3. After the meeting, Rollins sent a follow-up email to McIrvin and McMinnville High School principal Amy Fast that expressed the same concerns. Pl. Ex. 13; Vickers Decl. Ex. 1 ("Rollins Dep. II") 79:3-5, ECF 19-1.

On July 11, McIrvin and Principal Fast met with cross-country team parents to discuss the hiring of Wasmund. McIrvin Dep. I 93:13-17. At that time, neither McIrvin nor Fast expressed an intention to reverse the decision to hire Wasmund. Middleton Decl. Ex. 2 ("Fast Dep. I") 71:20-72:4, ECF 24-2. Rollins was not at that meeting, but McIrvin told the cross-country team members and their parents that he hoped Rollins would return as assistant coach. In McIrvin's words, he "spent the entire month trying to keep [Rollins] in the program." McIrvin Dep. I 130:23-24.

During the summer of 2019, new coach Wasmund held workouts with the cross-country team. Some girls attended the workouts regularly, but others did not, because they "did not feel safe with [Wasmund]." Parker Decl. ¶ 4. Parker Rollins attended one workout but did not go back. *Id.* S.B. attended three or four workouts until she found out about Wasmund's prior relationship with a student athlete. Middleton Decl. Ex. 5 ("S.B. Dep. I") 39:10-25. Five members of the girls' team worked out with Rollins instead. Vickers Decl. Ex. 7 ("Hanna Dep. I") 39:3-8, ECF 32-7.

Rollins met with McIrvin and Principal Fast again on July 17 to further discuss his concerns about the hiring of Wasmund. Rollins Decl. ¶8. On July 18, McIrvin and Fast met with Parker, A.R., S.B., and few other girls on the cross-country team. Parker Decl. ¶ 5. The student athletes told McIrvin and Fast that they did not feel safe with Wasmund as their coach because of his previous sexual relationship with an athlete he coached. *Id.*; Fast Dep. I 82:3-6. The students also complained about inequities between the girls' and boys' cross-country programs, including differences in the amount of money spent on each program and differences in the gear they received. McIrvin Dep. I 105:14-23; Fast Dep. I 82:3-23.

On July 21, Rollins met with Wasmund and McIrvin. Although Rollins continued to express concerns about Wasmund and MSD's treatment of the girls' cross-country program, McIrvin was "very optimistic . . . that [Rollins] was going to coach with [Wasmund]." McIrvin Dep. I 110: 16-18. On July 27, Rollins hosted a meeting of team parents to discuss the new head coach and the upcoming season. Pl. Ex. 20, ECF 24-20. After the meeting, one parent circulated a publication called "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel." Pl. Ex. 21, ECF 24-21. The document describes the NCAA's policy that any sexual relationship between a coach and an athlete is considered "sexual abuse," regardless of the athlete's age and whether the relationship is consensual. *Id.* at 5-7. Rollins then texted the parent group, stating that he would "be contacting the superintendent and school board" and that he "strongly recommended" the other parents do the same. Pl. Ex. 20. On the text exchanges, some parents agreed with contacting the superintendent, school board, and the local newspaper. *Id.* Other parents did not agree. *Id.* Rollins texted Wasmund and told him about the parents' conversation. Pl. Ex. 30, ECF 24-20. Wasmund asked that the parents not talk to the media about his past relationship and offered to resign from the head coach position. *Id.* Rollins also emailed McIrvin, explaining the outcome of the parent meeting and his communication with Wasmund. Pl. Ex. 22, ECF 24-22. McIrvin replied that he "[did] not support the method and/or potential actions taken by the group of parents seeking [Wasmund's] removal." *Id.*

On or about August 7, 2019, after Wasmund had resigned, McIrvin and Fast told Rollins that he would not coach cross-country at McMinnville High School again. Rollins Dep. 77:3-7; 78:6-9. McIrvin was specifically concerned about Rollins "going to the media . . . and using that threat as a way to . . . get [Wasmund] to resign." McIrvin Dep. I 112: 5-7.

On August 10, McMinnville announced to team parents by email that Wasmund had resigned, and that Josh Hanna had been hired as interim cross-country head coach. Pl. Ex. 23, ECF 24-23. On August 12, Rollins emailed McIrvin his resume and expressed his interest in being rehired as assistant coach for the girls' team. Pl. Ex. 24, ECF 24-24. McIrvin responded that he and Fast "[did] not believe [Rollins] being a part of the coaching staff this year is the right fit." *Id.* McIrvin asserts that his decision to not hire Rollins was because he was trying to put a coaching staff together that would "create unity" in the cross-country program. McIrvin Dep. II 137:18-23. McIrvin notes that some parents had told him that they supported the hiring of Wasmund and were not in favor of his resignation. *Id.* at 124:5-15. One parent said her daughter had not had a "great experience" with Rollins in the past. *Id.* at 124:10-12; 137:14-17.

McIrvin then hired Taylor Ford as a half-time assistant for the cross-country team. McIrvin Dep. I 141:2-20; Middleton Decl. Ex. 8 ("Ford Dep.") 8:22, ECF 24-8. Ford was a recent college graduate who had previously run cross-country at McMinnville High School and in college, but she had never coached before. McIrvin Dep. I 141:5-7; Ford Dep. 8:6-7. Ford was not specifically told that she was hired to coach the girls' team. Ford Dep. 8:8-9. She came to practices three days per week, at which time she would run with the girls and time their workouts. *Id.* at 9:1-22. Ford states that she did not do a lot of coaching and that her role was mostly to encourage the girls and support them at cross-country meets. *Id.* at 11:14-15; 14:8-9.

During the 2019 season, Parker and other members of the girls' team met twice with Principal Fast to express concerns about Hanna's coaching style and the lack of coaching they were receiving. Vickers Decl. Ex. 3 ("Fast Dep. II") 132:6-11, ECF 19-3. The girls complained that they were not being pushed hard enough. *Id.* at 132:24-133:1. Parker complained that Assistant Coach Ford did not do much coaching and that Head Coach Hanna did not spend time

specifically with the girls' team. Middleton Decl. Ex. 4 ("Parker Dep.") 58:3-20, ECF 24-4.

Hanna later explained that his strategy had been to reduce the girls' workouts as a way to prevent

injury to the top runners. Middleton Decl. Ex. 10 ("Hanna Dep. II") 37:18-21, ECF 24-10. Hanna

set a goal for the girls to win second place in the conference instead trying to repeat as

conference champions. Vickers Decl. Ex. 4 ("Hanna Dep. III) 38:10-15, ECF 19-4. He explained

that the lack of depth on the team and the amount of training it would take to repeat as

conference champions would risk injury. *Id.* at 37:24-38:3.

Before the summer of 2019, along with coaching the girls' cross-country team, Rollins

had volunteered in various ways with athletics in the McMinnville school system. He worked

with students in the weight room during a high school physical education teacher's strength and

conditioning class. Middleton Decl. 11 ("Houston Dep.) 12:19-24, ECF 24-11. In the fall of

2019, McIrvin told the physical education teacher that Rollins could not volunteer with the class.

*Id.* at 22:4-13. Rollins had also volunteered as a youth wrestling coach and was asked by other

coaches to work with the middle school wrestling team. Middleton Decl. Ex. 6 ("Barich Dep.")

14:5-13. During the fall of 2019, Rollins was asked to leave a middle school wrestling practice

because he did not have the necessary paperwork on file to volunteer. *Id.* at 19:13-23. Even after

completing the paperwork, Rollins was still not allowed to volunteer with the wrestling team.

Rollins Decl. ¶ 24. In addition, the new coach for the track team, Jennifer Gubrud, declined

Rollins's request to volunteer as distance coach as he had in the past. Pl. Ex. 27. Though she was

never specifically told she could not take Rollins as a volunteer, Gubrud "got the impression"

from Fast and McIrvin that "it might not be a good idea." Middleton Decl. Ex. 9 ("Gubrud

Dep.") 24:20-21.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Plaintiffs bring five claims for relief: (1) retaliation in violation of Title IX against MSD; (2) claims under 42 U.S.C. § 1983 for First Amendment violations against MSD, Principal Fast, and Athletic Director McIrvin; (3) retaliation in violation of Or. Rev. Stat. ('O.R.S.") 659.852 against MSD; (4) violation of O.R.S. 659A.203 for retaliation against whistleblowing by a public employee against MSD; and (5) violation of the free speech guarantee of Article I, section 8 of the Oregon Constitution against MSD. Defendants move for summary judgment on all claims.

## I.     Title IX Retaliation

Title IX of the Education Amendments of 1972 prohibits discrimination "on the basis of sex" by education institutions that receive federal funding. 20 U.S.C. § 1681(a). Title IX implies a private right of action against educational institutions that intentionally discriminate. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). The Supreme Court has recognized a cause of action when an institution retaliates against a person who complains of sex discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("[W]hen a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX.") (internal quotation marks omitted). Retaliation claims extend to those who speak out against the discrimination of others. *See id.* at 179 ("The statute . . . does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint.").

For Plaintiffs to succeed on the merits of their Title IX claim for retaliation, they must first make out a prima facie case by showing (1) they engaged in a protected activity; (2) they suffered an adverse action; and (3) there was a causal link between the two. *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012). The burden on plaintiffs to make this showing is low. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *see also Emeldi*, 698 F.3d at 724 ("[T]o make out a prima facie case, a plaintiff need only make a minimal threshold showing of retaliation."). If a plaintiff makes this showing, the burden shifts to the defendant to provide a legitimate, non-retaliatory reason for the action it took. *Ollier*, 768 F.3d at 867. If the defendant provides a legitimate reason, "the burden shifts back to the plaintiff to show that the reason is pretextual." *Id.*

### A.    Plaintiffs' Prima Facie Case

#### 1.    *Protected Activity*

To engage in protected activity that forms the basis for a Title IX retaliation claim, plaintiffs must show they complained about "sex discrimination." *Jackson*, 544 U.S. at 173. Plaintiff Rollins and Student Plaintiffs allege that MSD retaliated against them because they complained both about the hiring of Wasmund and about gender inequities in the cross-country program. Along with a claim for retaliation because of their own actions, Student Plaintiffs can bring a claim for Title IX retaliation based on Plaintiff Rollins's protected conduct. *See T.L. ex rel. Lowry v. Sherwood Charter School*, 68 F. Supp. 3d 1295, 1314-15 (D. Or. 2014) (holding that a student can bring a Title IX claim for retaliation directed at her based on the protected complaint made by her parent because she is within the "zone of interests that Title IX's implicit antiretaliation provisions seek to protect."). Although Defendants dispute that inequities in the cross-country program exist, they concede "that plaintiffs Ty Rollins and Parker Rollins engaged

in protected activity when they complained about perceived inequities in the cross-country program."[2] Def. Mot. 7, ECF 18.

Defendants dispute that Plaintiffs speaking out against MSD's hiring of Wasmund is protected activity. Plaintiffs claim that their acts of protest against Wasmund are protected under Title IX for two reasons: (1) if a similar sexual relationship had occurred between a coach and student athlete at McMinnville High School, the coach would have violated school district policy; and (2) deliberate indifference to reports of past sexual misconduct that create a heightened risk of sexual harassment or abuse can form the basis for a Title IX claim. *See Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1112 (9th Cir. 2020).

Plaintiffs' first reason is unavailing. Wasmund did not engage in a sexual relationship with a high school student—his relationship was with a consenting 19-year-old college student. MSD policy about relationships between coaches and students is not relevant to Wasmund's past relationship at Clackamas Community College.[3] Nothing about MSD's policy suggests that complaining about Wasmund's past relationship constitutes complaining about gender discrimination at McMinnville High School.

Second, Plaintiffs' reliance on *Karasek* is misplaced. In *Karasek*, the Ninth Circuit recognized a "pre-assault claim" as a cognizable theory of Title IX liability. *Id.* A pre-assault claim requires the plaintiff to show facts that "(1) a school maintained a policy of deliberate

---

[2] Defendants also acknowledge that whether actual inequities exist between the girls' and boys' cross-country programs is irrelevant "because plaintiffs make title IX retaliation claims, not Title IX equal treatment claims." Def. Mot. 7 n.6.

[3] Plaintiffs place great emphasis on a National Collegiate Athletic Association ("NCAA") model policy statement that describes any relationship between coaches and players as sexual abuse. DEBORAH L. BRAKE & MARIAH B. NELSON, STAYING BOUNDS: AN NCAA MODEL POLICY TO PREVENT INAPPROPRIATE RELATIONSHIPS BETWEEN STUDENT-ATHLETES AND ATHLETICS DEPARTMENT PERSONNEL 5, Pl. Ex. 21. But Clackamas Community College athletics are governed by the National Junior College Athletic Association rather than the NCAA.

indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual

harassment that was known or obvious (3) in a context subject to the school's control, and (4) as

a result, the plaintiff suffered harassment[.]" *Id.*

Because Plaintiffs bring Title IX retaliation claims rather than equal treatment claims,

they need not show that they suffered from harassment or abuse. But Plaintiffs must present

some facts to support an inference that MSD's decision to hire Wasmund "created a heightened

risk of sexual harassment that was known or obvious." Plaintiffs present no facts indicating that

Wasmund's prior consensual relationship with a 19-year-old college student, even if it could be

considered sexual abuse, created a heightened risk of sexual harassment or abuse to students at

McMinnville High School. Student Plaintiffs' description of feeling uncomfortable running

under Wasmund does not support an inference that Wasmund would engage in any conduct that

violates Title IX. Neither Parker nor A.R. report that they received or observed other student

athletes receiving unwanted attention from Wasmund. Plaintiffs provide no reports of Wasmund

engaging in sexual harassment or abuse during the two-year period he coached at another high

school after he left Clackamas Community College. Thus, MSD cannot be considered

deliberately indifferent to a heightened risk of sexual harassment or abuse, and Plaintiff's

complaints about the hiring of Wasmund do not constitute protected activity under Title IX. For

the purposes of their Title IX retaliation claims, Plaintiff's only engaged in protected activity to

the extent that they complained to McIrvin and Fast about existing gender inequities in the

McMinnville High School cross-country program.

2.    *Adverse Actions*

Defendants argue that even if Plaintiffs engaged in protected activity, they suffered no

adverse actions. Rollins asserts that the adverse actions against him were (1) not being allowed to

work as assistant coach for the cross-country team despite having had great success in previous

years; and (2) being barred from his previous volunteer coaching opportunities. Defendants point

out that Rollins was not fired from his position, but voluntarily resigned. Defendants also assert

that the school district did not prohibit Rollins from volunteering, but only asked him to

complete appropriate paperwork to volunteer. Defendants note that Rollins was still able to

volunteer in some capacity within the school district.

      The Ninth Circuit uses a reasonable person standard to determine whether an adverse

action occurred. In other words, the element is met when the challenged action by the defendant

might have dissuaded a reasonable person from speaking out against discrimination. *Emeldi*, 698

*F.3d at 726*. Being terminated from a position is not a threshold requirement. In *Emeldi*, the court

found an adverse action where the university did not dismiss a PhD candidate, but "as a practical

matter, rendered her unable to complete the degree." *Id.* In addition, the Ninth Circuit uses the

same criteria for adverse actions under Title IX as it does for employment discrimination claims

under Title VII of the Civil Rights Act of 1964. *Id.* Title VII recognizes a refusal to hire on the

basis of race, color, religion, sex, or national origin as an adverse act. 42 U.S.C. § 2000e-2(a)(1).

      Thus, the relevant question is not whether Rollins was terminated from his coaching

position or prevented from volunteering, but whether a reasonable person would have been afraid

to speak out based on the actions MSD took. Whether a reasonable person in Rollins' position

would have been deterred from speaking out is a factual dispute that the Court cannot resolve on

a motion for summary judgment.

      Student Plaintiffs allege that MSD's adverse act against them was hiring an unqualified

assistant coach for the girls' team and not coaching them effectively in retaliation for their

protected conduct.[4] Pl. Resp. 16, ECF 23. For student athletes, inadequate coaching and a lack of individualized attention constitutes an adverse action. *Ollier*, 768 F.3d at 867. In *Ollier*, the court found an adverse action when a successful girls' softball program was disrupted because their coach "was fired and replaced by a far less experienced coach," among other claims. *Id.*

Student Plaintiffs present evidence that after winning the conference championship the prior year, they received little attention and substandard coaching during the fall 2019 cross-country season. Taylor Ford, the newly hired half-time assistant, admits that she did not do a lot of coaching. Parker Rollins states that she had to take on some of the coaching responsibilities and "had to help [Ford] understand what she needed to be doing and what a coach would do." Parker Decl. ¶ 6. Student Plaintiffs also claim that the new head coach, Josh Hanna, "did not spend time specifically with the girls' team" and "worked almost exclusively with the boys." *Id.* MSD's decision to hire an inexperienced assistant coach, by itself, is not enough to be considered an adverse action against Student Plaintiffs. But Student Plaintiffs present facts showing they also received less attention and less training from the new head coach, particularly in comparison to the attention given to the boys' team. Thus, viewed in the light most favorable to them, Student Plaintiffs assert enough facts from which a reasonable jury could find an adverse action on the part of Defendants.

3.    *Causation*

Next, for a prima facie Title IX retaliation claim, Plaintiffs must show a causal link between their protected activity and Defendants' adverse acts against them. The causal connection element is construed broadly. Plaintiffs must only show that the protected activity

---

[4] Plaintiff S.B. cannot make this claim because she was not a member of the cross-country team during the relevant time period.

and adverse action "are not completely unrelated." *Emeldi*, 698 F.3d at 726 (internal quotation marks and citation omitted). The proximity of time between the complaint of discrimination and the alleged retaliatory act is strong circumstantial evidence of causation. *Id.*; *see Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002) (noting that timing alone can satisfy the causation element in an employment discrimination case).

As to Plaintiff Rollins, viewing the facts in the light most favorable to Plaintiffs, causation can be inferred from a temporal relation between Rollins's protected activity and Defendants' alleged adverse action. Prior to Rollins's meeting with team parents to discuss the girls' cross-country program, McIrvin wanted to retain Rollins as assistant coach. Even after Rollins turned in his keys and ID badge, McIrvin, "spent the entire month trying to keep [Rollins] in the program" and get him to return as assistant coach. McIrvin Dep. I 130:23-24. But when Rollins expressed his intention to contact the superintendent and the school board, McIrvin changed his stance and refused to rehire Rollins as assistant coach. According to Rollins, McIrvin told him that he would never coach at McMinnville High School again. Regardless of whether McIrvin and MSD had other, legitimate reasons to not rehire Rollins, the timing of their refusal to rehire is sufficient to create a question of fact regarding causation. Construing the facts in the light most favorable to the non-moving party, Rollins has established a prima facie case of Title IX retaliation.

For Student Plaintiffs, Defendants allege that their retaliation claims are causally reversed. Def. Reply 7, ECF 31. Defendants claim that Student Plaintiffs did not like their new coaches and then complained. *Id.* But Defendants misstate Plaintiff's allegations. First, Student Plaintiffs present evidence of Defendants' retaliatory acts against them during the fall 2019 cross-country season. Those alleged acts were committed after Student Plaintiffs had met Fast

and McIrvin that July to express their concerns about MSD's disparate treatment of the girls'

cross-country team. Second, Student Plaintiffs can assert Title IX retaliation based on the

protected activity of their father and former coach, Plaintiff Rollins. *See T.L. ex rel. Lowry*, 68 F.

Supp. 3d at 1314-15. The adverse acts by MSD against Student Plaintiffs occurred after Rollins

stated he would contact the superintendent and school board about McMinnville High School's

disparate treatment of the girls' cross-country team. As with Rollins, the temporal relation

between their complaints about the cross-country program and the adverse acts by MSD provides

sufficient circumstantial evidence of causation. Therefore, Student Plaintiffs have also made out

a prima facie case of Title IX retaliation.

       **B.**       **Retaliatory or Pretextual Reasons for Adverse Action**

Because Rollins can make a prima facie showing of Title IX retaliation, the burden shifts

to Defendants to present a non-retaliatory reason for not rehiring Rollins and preventing him for

volunteering. Defendants present evidence that some student athletes did not like Rollins

coaching style and felt comfortable with Wasmund as coach. Parents were fractured in their

feelings about Wasmund's forced resignation, and Defendants assert that they wanted a coaching

staff that would unify the cross-country community. Because they legitimately regarded Rollins

as an instigator of Wasmund's resignation, Defendants have established a legitimate, non-

retaliatory reason for not rehiring Rollins as assistant coach. Defendants also state legitimate

reasons for preventing Rollins from participating in certain volunteer activities, such as not

wanting him to work with athletes during school hours and requiring him to complete

appropriate paperwork. Defendants, in fact, assert that they did not prevent Rollins from

volunteering—they only asked that he "follow the same rules as everyone else." Def. Mot. 9.

Although Defendants present a legitimate reason for preventing Rollins from coaching and volunteering, a jury could reasonably conclude that Defendants' explanations are pretextual. As with causation, temporal proximity of a plaintiff's protected activity and a defendant's adverse action can inform the pretext analysis. *T.L. ex rel. Lowry,* 68 F. Supp. 3d at 1313. Based on the presented facts, Defendants' attitude towards and treatment of Rollins changed after he complained of inequities in the cross-country program. A reasonable jury could infer that that MSD's stated reason for not rehiring Rollins was pretext and could find that Defendants acted in retaliation for Rollins complaining about the school district's disparate treatment of the girls' cross-country team.

Defendants also present legitimate, non-retaliatory reasons for reducing Student Plaintiffs' training and not pushing them to win the conference championship again. Coach Hanna makes a compelling case for his stated coaching strategy. He wanted to prevent injury to the top runners on a team that did not have a lot of depth. However, the strategy decisions do not provide legitimate reasons for paying little attention to the girls' team. A reasonable jury could find Hanna's explanation for reducing the girls' coaching to be pretextual.

Construing the facts in the light most favorable to Plaintiffs, both Rollins and Student Plaintiffs have made out prima facie cases of Title IX retaliation, and a reasonable jury could find that Defendants' hiring decision as to Rollins and coaching decisions as to Student Plaintiffs were pretextual. Thus, the Court denies summary judgment for Defendants on Plaintiffs' Title IX retaliation claims.

## II.    Plaintiffs' § 1983 Claims: First Amendment Retaliation

Defendants McIrvin, Fast, and MSD move for summary judgment on Plaintiffs' § 1983 claims for retaliation against protected speech in violation of the First Amendment. Plaintiff

Rollins and Student Plaintiffs seek both money damages and injunctive relief against future "unlawful retaliation because of speech on matters of public concern" by MSD. Compl., Prayer for Relief (a), (c).

>   **A.    Retaliation in Violation of the First Amendment**

>   >   1.    *Ty Rollins*

The Ninth Circuit analyzes First Amendment retaliation claims in the public employment setting under the framework established by *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).[5] Under *Pickering*, courts evaluate restraints on public speech by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Oyama v. Univ. of Hawaii*, 813 F.3d 850, 860 (9th Cir. 2015) (quoting *Pickering*, 391 U.S. at 568). To establish retaliation by a public employer, a plaintiff must show that (1) they spoke as a private citizen and not in their official capacity as a public employee; (2) they spoke on a matter of public concern; (3) the plaintiff's protected speech was a substantial motivating factor in the employer's adverse action; (4) the employer did not have an adequate justification for treating the plaintiff differently than members of the general public; and (5) the employer would not have taken the adverse employment action absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

Defendants concede that Rollins spoke as a private citizen, but they argue that he did not speak on a matter of public concern. Speech involves a matter of public concern when it relates to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461

---

[5] Plaintiffs and Defendants agree that although Rollins was not an employee at the time of the alleged retaliation, *Pickering* provides the appropriate framework for analyzing his claims because he was an applicant for public employment.

U.S. 138, 146 (1983). But speech that involves "individual personnel disputes and grievances" is not a matter of public concern. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). Defendants argue that when Rollins complained about the hiring of Wasmund, "he was concerned about whether he would have autonomy with the program." Def. Mot. 11. But Defendants present no facts to support their conclusion about Rollins's motivation. Rollins spoke to McIrvin, Fast, and team parents about his concerns regarding Wasmund's past relationship with a female student athlete and the treatment of girls on the McMinnville cross-country team. Issues of gender discrimination in athletics are matters of public concern. *See Burch v. Regents of the Univ. of California*, 433 F. Supp. 2d 1110, 1130 (E.D. Cal. 2006) (holding that a wrestling coach's speech about gender discrimination affecting female wrestlers was a matter of public concern). Thus, Rollins spoke as a private citizen on a matter a public concern.

Next, whether Rollins's protected speech was a substantial motivating factor in Defendants' decision to not rehire him as assistant coach is a question of fact. As with Plaintiffs' Title IX claim, the temporal association of Rollins's speech and Defendants' decision not to rehire him suggests a causal relationship. But the ultimate determination of whether Defendants' motivation for the actions they took can only be made by weighing disputed facts. A reasonable jury could find that Defendants prevented Rollins from coaching because he spoke out about gender inequities in the McMinnville High School cross-country program.

Similarly, whether Defendants had adequate justification to treat Rollins differently than the members of the general public requires resolution of disputed facts. Defendants assert that their adverse employment decision, even if motivated by Rollins's protected speech, was justified by their goal of preventing disruption and promoting unity within the cross-country program. Plaintiffs dispute whether there was any evidence of potential disruption to the cross-

country program. These factual disputes cannot be resolved by this Court on a motion for summary judgment.

2.    *Student Plaintiffs*

Defendants also move for summary judgment on Student Plaintiffs' claim brought under the First Amendment. The Supreme Court has clearly stated that public school students have First Amendment free speech rights. *See Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969) (stating that students do not "shed their constitutional rights to free speech at the schoolhouse gate"). But student speech may be subject to more restrictions and is analyzed differently than that of public employees. To establish a claim for retaliation in violation of their First Amendment free speech rights, students must show that (1) they were engaged in a constitutionally protected activity, (2) the defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendants' conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). If plaintiffs establish these elements, the burden shifts to the defendants to show that they would have taken the same action even in the absence of the protected conduct. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001).

Defendants concede that Student Plaintiffs' complaints about gender inequity in the cross-country program is constitutionally protected speech. But Defendants assert that Student Plaintiffs' claims are "wholly derivative of Ty Rollins' claims" and are causally reversed. Def. Mot. 13. Defendants again misstate Student Plaintiffs' claim. Student Plaintiffs met with Defendants McIrvin and Fast in July 2019 to express their concerns about Wasmund and about gender discrimination in the cross-country program. They also refused to workout with

Wasmund that summer because they were concerned about unwanted sexual attention. Plaintiffs then allege they were provided inadequate coaching and not pushed hard enough during the fall 2019 cross-country season in retaliation for speaking out during the summer. If Defendants deliberately provided poor or inadequate coaching to a previously successful team, a reasonable jury could find that such action would chill a student athlete of ordinary firmness from voicing concerns about the program. *See Arizona Students' Ass'n. v. Arizona Bd. of Regents,* 824 F.3d 858, 868 (9th Cir. 2016) ("[T]he test for determining whether the alleged retaliatory conduct chills free speech . . . asks whether the retaliatory acts would lead ordinary students in the plaintiffs' position to refrain from protected speech.") (internal quotation marks and citation omitted).

The next questions are whether Student Plaintiffs expressive conduct was a substantial motivating factor for Defendants to provide inadequate coaching and whether Defendants "would have taken the same action even in the absence" of Students Plaintiffs' speaking out against Wasmund and the program. *Pinard*, 467 F.3d at 771. "Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). Even if Student Plaintiffs had no entitlement to a certain level of coaching, providing inadequate coaching violated their First Amendment rights if Defendants did so with a retaliatory motive. Determining Defendants' motives for their hiring and coaching decisions requires resolution of disputed facts. Viewing the facts in the light most favorable to Student Plaintiffs, a reasonable jury could infer that Defendants reduced coaching for the girls' team because several girls spoke out against and refused to train with Wasmund.

**B.     Qualified Immunity**

Defendants McIrvin and Fast assert that they are entitled to qualified immunity. A defendant is entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald¸* 457 U.S. 800, 818 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne,* 526 U.S. 603, 615 (1999).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citation omitted, emphasis in original). Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland,* 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cnty. of Clackamas,* 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's

error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

Plaintiffs have created questions of fact as to whether Defendants Fast and McIrvin violated Plaintiffs' First Amendment rights. The Court must now consider whether those rights were clearly established by fall 2019, which was the time of the alleged unconstitutional actions. "To determine whether [an official] violated clearly established law, we look to cases relevant to the situation [the official] confronted, mindful that there need not be a case directly on point." *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (internal quotation marks and citation omitted). And, while there need not be a case directly on point, "existing precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary." *City of Escondido v. Emmons*, ___U.S.___, 139 S. Ct. 500, 504 (2019) (internal quotation marks and citation omitted); *see Anderson v. Creighton* 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

Plaintiffs cite cases in which the Ninth Circuit has held that disciplinary action by a school district in response to a teacher or coach criticizing district policies violated the First Amendment. *See Anderson v. Cent. Point Sch. Dist. No. 6*, 746 F.2d 505, 506-508 (9th Cir. 1984) (holding that the First Amendment rights of an assistant coach were violated when a school superintendent suspended him for communicating directly with school board members about problems in the school's athletic program); *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 514 (9th Cir. 2004) (holding that retaliation against a physical education teacher for complaining about discrimination against disabled students violated the teacher's First

Amendment rights). Defendants claim these cases do not reflect the exact constitutional violation alleged here. Specifically, Defendants point out that the retaliation in these cases involved disciplinary acts directed at plaintiffs who were employees at the time. Defendants contend that their refusal to rehire Rollins is not an analogous situation.

The Supreme Court has clearly established that a public employer violates a prospective employee's rights when it refuses to hire the candidate in retaliation for engaging in constitutionally protected free speech. *See Perry v. Sinderman*, 408 U.S. 593, 598 (1972) (holding that a decision to not renew a nontenured public school teacher's one-year contract "could not be made in retaliation for his exercise of the constitutional right to free speech*"); see also Shelton v. Tucker*, 364 U.S. 479 (1960) (holding that a state cannot condition the year-to-year rehiring of teachers on compelled disclosures that violate the First Amendment). Ninth Circuit case law makes clear that retaliation in response to a person criticizing a public school district violates that person's constitutional rights. *See Anderson*, 746 F.2d at 507; *Settlegoode*, 371 F.3d at 516*; Keyser,* 265 F.3d at 749. Thus, McIrvin and Fast violated clearly established law if they retaliated against Rollins by refusing to rehire him because he engaged in constitutionally protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 ("Even though [plaintiff] could have been discharged for no reason whatever, . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.").

As to Student Plaintiffs, *Pinard* established that in the Ninth Circuit, school districts may not retaliate against student athletes who engage in protected speech. 467 F.3d at 772. In *Pinard*, several high school basketball players were permanently suspended from the team for engaging in protest against an abusive coach. *Id.* at 761-62. Here, Student Plaintiffs allege a different form

of retaliation—inattention by coaching staff, withholding of adequate coaching, and worsening gender discrimination. Although the alleged retaliatory acts are different, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Eng*, 552 F.3d at 1076 (internal quotations and citation omitted). The key similarity with *Pinard* is that the retaliatory act "would lead ordinary student athletes in the plaintiffs' position to refrain from complaining[.]" *Id.* at 770. The form of retaliation need not be the same for the right to have been clearly established.

The Court concludes that because the constitutional rights in question were clearly established, Defendants McIrvin and Fast are not entitled to qualified immunity. Summary judgment on Plaintiffs' § 1983 claims is denied.

### C.    *Monell* Liability for McMinnville School District

Defendants argue that there is no basis for MSD to be liable for the alleged violation of Plaintiffs' constitutional rights by Defendants McIrvin and Fast.

For a municipality to be liable under § 1983, Plaintiffs must show that a municipal custom or policy caused the violation of their constitutional rights. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that a municipality is a "person" subject to liability under § 1983 when it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). The municipality itself must cause the constitutional deprivation and may not be held vicariously liable for the unconstitutional acts of its employees under a *respondeat superior* theory. *Id.*; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). The Ninth Circuit has held that a plaintiff may establish municipal liability under *Monell* in one of three ways: (1) the

government official "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity," (2) "the individual who committed the constitutional tort was an official with final policy-making authority," or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations omitted).

As discussed above, the Court finds that questions of fact preclude granting summary judgment for the individual Defendants on Plaintiffs' constitutional claims. The Court now analyzes each of the avenues through which Plaintiffs allege *Monell* liability to determine whether MSD is entitled to summary judgment on Plaintiffs' *Monell* claims.

First, Plaintiffs allege that Defendants retaliated against them pursuant to a policy, custom, or practice. Compl. ¶ 39. Generally, to succeed on a *Monell* claim under this theory, the custom or practice "must be so 'persistent and widespread' that it constitutes a 'permanent and well settled [municipal] policy.' " *Trevino v. Gates*, 99 F.3d 911, 919 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691).  Plaintiffs allege no facts and make no legal arguments to support the claim that MSD has a policy, custom, or practice of retaliating against either students or employees who exercise their First Amendment rights to free speech. "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom" under *Monell*. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

Second, Plaintiffs' base their *Monell* claim on Defendants McIrvin and Fast being the "final policymakers with respect to retaliatory actions." Compl. ¶ 40. Determining whether an official is a final policymaker is a "legal question to be resolved by the [court]." *Shutlz v. Multnomah Cnty.*, No. 08-CV-886-BR, 2009 WL 1476689, at *5 (D. Or. May 27, 2009) (quoting

*Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)). A final policymaker must have such authority that "a final decision by that person may appropriately be attributed to the [school] [d]istrict." *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004). But an official can be a final policymaker by having authority just "in a particular area, or on a particular issue." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997). And policymaking authority may be delegated in certain circumstances. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124.

Under Oregon law, school boards have general final policymaking authority for school districts. *See* O.R.S. § 332.072 ("[D]istrict school boards have control of the district schools and are responsible for educating children residing in the district."). The McMinnville School Board establishes general policy for hiring employees. Pl. Ex. 31, ECF 24-31. Plaintiffs assert that the school board delegated authority for hiring all personnel to the superintendent who then delegated final policymaking authority for hiring coaches at McMinnville High School to Defendants McIrvin and Fast. Pl. Resp. 29. The question the Court must ask is "whether the policymaker merely has delegated discretion to act, or whether it has done more by delegating final policymaking authority." *Christie*, 176. F.3d at 1236.

Defendants McIrvin and Fast made the decision to not rehire Rollins, and they are also responsible for the decisions to hire coaches who allegedly provided Student Plaintiffs with substandard coaching. But the authority to make discretionary hiring decisions does not by itself constitute final policymaking authority. *See Vejo v. Portland Pub. Schs.*, 204 F. Supp. 3d 1149, 1163 (D. Or. 2016) ("The authority to hire and fire is insufficient to show policy making authority; the plaintiff must show the decision was made by a person with the power to establish policy for the entire entity."). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Even if Defendants McIrvin and Fast made hiring decisions that violated Plaintiffs' constitutional rights, Plaintiffs have presented no facts indicating that those decisions established official hiring policy for MSD.

Third, to establish that a municipal entity ratified a subordinate's discretionary decision, plaintiffs must show that the entity both approved of the decision and the basis for it. *Gillette*, 979 F.2d at 1348. Failure to overrule a discretionary decision made by a subordinate is insufficient to create municipal liability under *Monell*. *Id.* The McMinnville School Board approves a "monthly personnel report" that includes all the employee hiring and terminations at McMinnville High School. Middleton Decl. Ex. 12 ("Russell Dep.") 6:21-7:4. But to be liable for any unconstitutional hiring decisions by Defendants McIrvin and Fast, the school board as final policymaker must have known that the actions were unconstitutional and made the deliberate choice to approve them. *See Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that for municipal liability, a final policymaker must make "a deliberate choice to follow a course of action . . . made from among various alternatives) (internal quotation marks and citations omitted). Plaintiffs do not provide any facts that would suggest the school board ratified the alleged unconstitutional acts of McIrvin and Fast. Because the school district is not liable for the discretionary hiring decisions made by McIrvin and Fast under *Monell*, the Court grants summary judgment for MSD on Plaintiffs' § 1983 damages claims.

## III.    Retaliation Against Students under O.R.S. 659.852

Student Plaintiffs bring a claim against MSD for retaliation in violation of Oregon state law. Compl. ¶¶ 43-46. Under Oregon law, "[a] student of an education program may not be subjected to retaliation by an education program for the reason that the student has in good faith reported information that the student believes is evidence of a violation of a state or federal law,

rule or regulation." O.R.S. 659.852(2).[6] The statute authorizes students or their parents or guardians to bring civil actions against entities they allege violate the statute. O.R.S. 659.852(3).

The Court finds that a claim under the O.R.S. 659.852 should be analyzed in the same manner as a Title IX retaliation claim.[7] Thus, as with their Title IX claim, questions of fact exist as to whether MSD retaliated against Student Plaintiffs in violation of O.R.S. 659.852. Summary judgment for Defendants on this state statutory claim is denied.

## IV.    Retaliation by Public Employer under O.R.S. 659A.203

Plaintiff Rollins brings a claim for retaliation under an Oregon whistleblower law that protects public employees. Under Oregon statute, a public employer may not "take or threaten to take disciplinary action against an employee for the disclosure of information that the employee reasonably believes is evidence of . . . [a] violation of any federal, state or local law, rule or regulation by the public . . . employer." O.R.S. 659A.203(1)(b)(A). Importantly, the statute only protects employees from retaliatory actions by their public employers. *See Delia v. Benton Cnty.*, No. 05-6123-HO, 2006 WL 3491081, at *5 (D. Or. Dec. 1, 2006) (holding that only current employees, but not applicants for employment, are protected by O.R.S. 659A.203); *Howard v. City of Coos Bay*, 871 F.3d 1032 (9th Cir. 2017) (holding that a job applicant is not protected under O.R.S. 659A.203, "regardless of any status as a former employee").

Rollins was not employed by MSD at the time of the alleged retaliatory acts. Rollins resigned from his assistant cross-country coach position in July 2019. He alleges that the school

---

[6] The definition of "retaliation" includes "other adverse action that substantially disadvantages a student in academic, employment or extracurricular activities." O.R.S. 659.852(1)(b).

[7] Although there is no case law that applies O.R.S. 659.852, the statute's text outlines elements that are nearly identical to those required for Title IX retaliation claims.

district retaliated against him in fall 2019 by not rehiring him and by barring him from volunteer coaching. These alleged retaliatory actions occurred when he was no longer an employee.

Rollins asserts that he brings this claim under section (1)(d) of O.R.S. 659.203A rather than section (1)(b), and that section (1)(d) is not limited to employees.[8] Pl. Resp. 33. However, Rollins provides no basis for his assumption. In fact, the text of section (1)(d) refers to sections (1)(a)-(c) of the statute, which specifically apply only to "employees." O.R.S. 659A.203(a)-(d). In addition, administrative rules clarify that section (1)(d) only applies to employees. Or. Admin. R. 839-010-0050.[9] Rollins, therefore, has no legal basis for his claim under O.R.S. 659A.203. The Court grants summary judgment for Defendants on this claim.

## V.    Violation of the Oregon Constitution Article I, Section 8

Plaintiffs' final claim asserts that MSD violated the free speech guarantee of the Oregon Constitution.[10] This Court has previously stated that Article I, section 8 does not provide greater protection than the First Amendment against retaliation. *German v. Eudaly*, No. 3:17-cv-2028-MO, 2018 WL 3212020, at *5 (D. Or. June 29, 2018). The Court also notes that there is no private right of action for damages under the Oregon Constitution. *See Hunter v. City of Eugene*, 309 Or. 298, 304, 787 P.2d 881, 884 (1990) ("[P]ersons whose rights are violated by a municipality or its employes [sic] may not bring an action for damages against the municipality

---

[8] O.R.S. 659.203(1)(d) states that is unlawful for a public employer to "[d]iscourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section."

[9] Or. Admin. R. 839-010-0050(1) states that "ORS 659A.203 (1)(b) and (d) require that a public employer not prohibit, discourage, restrain, dissuade, coerce, or otherwise interfere with any *employee* disclosing to any person, or take or threaten to take disciplinary action against any *employee* for disclosing information[.]" (emphasis added).

[10] "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]" OR. CONST. art. I, § 8.

or its employes [sic] directly under the constitution."). Plaintiffs clarify that, on their claim under the Oregon Constitution, they only seek declaratory and injunctive relief. Pl. Resp. 31.

As to Plaintiffs' claims for injunctive relief, there is no guiding caselaw for retaliation claims under the free speech clause of the Oregon Constitution. While no state or local laws are at issue here, Plaintiffs assert that their claim is an as-applied challenge to Defendants' unconstitutional application of their statutory power to conduct school district business. Pl. Resp. 32. But Plaintiffs provide no support for their proposition. Because on its face, Article I, section 8 applies only to enacted laws that restrain free speech, and no law or ordinance or even policy is at issue here, the Court finds no basis to grant relief to Plaintiffs under the Oregon Constitution. Summary judgment for Defendants on the state constitutional claim is granted.

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment [18]. The Court grants summary judgment for McMinnville School District on Plaintiffs' claims under 42 U.S.C. § 1983, O.R.S. 659A.203, and Article I, section 8 of the Oregon Constitution. The Court denies summary judgment for McMinnville School District on Plaintiffs' claims under Title IX and O.R.S. 659.852 and for Defendants Fast and McIrvin on Plaintiffs' § 1983 claims.

IT IS SO ORDERED.

DATED:__November 27, 2021____.


_Marco Hernández_____
MARCO A. HERNÁNDEZ
United States District Judge